Calling case numbers 16-4324 and 17-3832 and 17-3841 that's Premium Freight Management v. PM Engineered Solutions and Bozell Industries Georgia Incorporated. Oral argument not to exceed 15 minutes per side. Mr. Mao for the appellant. Good morning, Your Honors. We've requested to reserve three minutes for rebuttal. That is fine and you may proceed. Chief Judge Cole may please the court. The District Court's finding that there was a cup of violation in this not uncommon dispute between companies that enter into a manufacturing contract must be reversed. It must be reversed because Michigan law applies to PMES's TOR claim. Michigan is the state with the most significant relationship to the parties in the occurrence. In the alternative, the cup of can fails because at most this is a breach of contract case without substantial aggravating circumstances. The record does not establish that Bozell engaged in unfair, unconscionable or unscrupulous conduct. Now we start with the restatement because if the court decides that Michigan law applies to PMES's TOR claim, it need not address the cup of issues on the merits. Out of curiosity, if you went on that, what would happen? Would we have a new debate about whether there was a problem under Michigan law or do the parties agree on this point? What would happen next? What would happen is that the cup of claim then would fail and then the other claims that we did not appeal would remain since there was no conflict. They would not have an opportunity to seek attorney's fees damages under Michigan law to the extent it has an equivalent statute or common law? Your Honor, we would suggest not. They had the opportunity to plead in the alternative if they could have found a Michigan statute that provided them that relief. They never identified that in their briefs. They never requested an opportunity if the court were to say, yes, Michigan law applies. Of course, they have been winning throughout. But this was the chance to do it. This is the first time that the restatement was actually truly argued before the court, before this panel. And so if Michigan law does apply, this was their chance to say, well, we would have requested relief to argue something else. For instance, the Michigan Consumer Protection Act has similar language than CUPA, but as we pointed out, that claim would have failed. There would have been no basis to allege a claim under that because this was a business transaction. With respect to the restatement, the Ohio law applies. PMES concedes that the district court erred in applying the wrong restatement rule in analyzing what is the law that applies to the tort claim. So we have to go to the restatement for torts. And that test points us to, that test is, what is the state with the most significant relationship to the parties in occurrence? And as this court has recognized, that with interstate transactions, the location may point to different directions. And so I think the key is to parse through the record and identify what are the determinative factors that point the scale either way. Place of injury, one of the most important factors and maybe the most important factors? It can be sometimes. But not here, Your Honor, we submit. Place of injury would have been Connecticut though? It would have been certainly partly experienced in Connecticut, unquestionably. That's the principal place of business. We did point out that it's been represented as a division of PSM Industries, which is a California company. And that the courts recognize that in such a case, the injury may not only be in Connecticut but also in California. But in terms of the importance, in terms of the importance, in this case, as this court has recognized, even in the Muncie case, that the injury, one, is not dispositive. And two, it must be weighed relative to the other factors. So we go to, since this is not a personal injury case, section 146 of the restatement does not apply. Section 145 applies. And 145 tells us that the factors must be weighed based upon their relative importance. And sometimes injury can be heightened importance in a personal injury case, a consumer protection case. But this is different. When you compare it to the relative factors, where does it fit within the relative weight? We submit that it does not get heightened weight. One, it's an injury to a business and a financial injury, which is different than the personal injury. And in addition, it has to be compared to the other factors. It doesn't sit in a vacuum. Where is it compared to the other factors? And so the place where the relationship is centered, that is a significant factor here. This wasn't a case, it wasn't a negligence case or a tort case between strangers. This is a case involving two companies that entered into a nearly two-year-long business relationship. Another factor that's entitled to special significance is where the conduct occurred. And as the court pointed out, that if the injury occurred in Connecticut, the conduct surely occurred in Michigan. When you go to... Or Belgium. When you go to PMS's, well, we can look at that and we can talk about the conduct. But when we go to PMS's complaint, their counterclaim, and we look at the allegations of what is the conduct that gave rise to this alleged COPPA claim, it's the starting production too early. Starting production earlier than we anticipated. That occurred in June of 2014, before Mr. Schneider was ever on the scene. Increasing the volume of production. That occurred in the summer of 2014, before Mr. Schneider was ever involved. Mr. Schneider from Belgium got involved at a very limited period of time. At the end of September and the beginning of October, during conversations with PMS. But the other factors that they allege, and their other conduct that they allege in that COPPA claim, such as the failure to pay freight, the failure to pay account receivables, those are decisions made by Bozell Industries, Georgia, in Ypsilanti, Michigan. Those are decisions after the relationship ended in October of 2014, where Bozell then did its accounting and said, we suffered a harm. We suffered a harm, and we're not... And your response, so we're not paying the account receivables, that's a set off. And the freight charges, we believe you're responsible for under the general terms and conditions and under trade practice. Those issues were litigated. But the conduct, that conduct occurred in Michigan. And the reason that conduct... Tell me what I'm missing. I would have gone into this case saying, you know, just forget the actual facts here. But in a case where you have two businesses, one in one state, one in the other, the misconduct occurs in state A, the injury in state B. In a tort claim, normally, you're going to say state B controls the place of injury. That's what I would have thought. Am I right about that? Forget this case for a second. Aren't I right about that general way of thinking about it? Generally, but generally you see it being applied under Section 146. But if that's the general rule, all you're doing is deciding to talk a lot about the misconduct, alleged misconduct. I know you don't think it's misconduct in Michigan. But I'm just telling you, the norm in a tort case is where the injury was. It's very strange to think it wasn't in Connecticut. And it's a two-state problem, basically. Exactly, and so that's why, as you pointed out in the Pilgrim case, that there's going to be conduct here, injury there. So what are the other factors that tilt the scales to Michigan? And we think it's three. I mean, the first factor is that PMES has a regional sales manager who is located in Michigan. PMES was in Michigan, in Adrian, Michigan, right down the road from Ypsilanti. Of course they were there. They were delivering products. No, no, but that's where its regional sales manager is. I mean, they solicited. So PMES has a presence. PMES has a presence in Michigan. Bozo has no presence in Connecticut. And that presence in Michigan tilts the factor. That goes to which state has the most significant relationship. Where is their relationship centered? Just like in the Muncie case, when you're looking at two businesses, where is their relationship centered? And so here, when PMES from Michigan reached out to Bozo in Michigan, that initiated the relationship in Michigan. So you have this independent contractor in Michigan who represented PMES, but you also have the flanges manufactured, of course, in Connecticut and delivered to Bozo, one could argue, in Connecticut. So, yeah, I mean, there are factors going both ways, and I guess I'm not persuaded that it's so clear that the relationship is centered in Michigan as opposed to Connecticut. I mean, there's a great deal of the underlying contract that's performed in Connecticut. And that's sort of the equal. The contract is performed in Connecticut, but it's assembled in Ypsilanti. And so the points that make the difference are the three points, is that he's more than an independent contractor. When we actually go to the language, I mean, what did he say? The question asked to him was, what was your role? I represented PM Engineered Solutions. And the question was asked to him. And so you negotiated with Bozo on behalf of PMES. That is correct. He negotiated. He entered the contract with Bozo in Michigan. So that factor is significant in terms of what state has the relationship. Another factor that is significant is the presence of General Motors. The presence of General Motors ties these parties together in terms of the relationship. And the presence of General Motors matters. They argue, obviously, that it's not a party. But the language is not limited in the restatement. The language in the restatement is the state with the most significant relationship to the occurrence and the parties. General Motors, which is in Michigan, no question, their name was raised 149 times in this case. And General Motors made the decisions in this case that everybody else had to respond to. The decision to move to a powdered flange. The decision to accelerate production. The decision to conduct the root cause analysis. General Motors led that. And the decision to revert back to its prior flange when PMES was producing defective flanges. So General Motors is replete throughout this case. And another thing is that the court recognized that. The court, and we didn't point it out in the briefs, but we'd like to point it out here in its post-trial questions, Doc 117 of the lower court docket asked the court, asked the parties, to identify the testimony or exhibits that reflect when and why PMES had direct contact with General Motors. PMES answered that. We had direct contact as part of the root cause analysis for the cracking problems in October 14. It points to a string of emails between PMES and General Motors. It points to the General Motors document that shows that the contract or that the flange is being reverted back to the prior model. And so these are the key factors that we say overcome the injury, which in this case, like Muncie, is not entitled to Peculiar White. Thank you. Your initial time has expired, Mr. Mouw. We appreciate the argument, and we'll hear from you in just a bit. Good morning, Your Honor. May it please the court. Henry Weinstock for Appellee and Cross-Appellant PM Engineered Solutions, Inc. I suppose the place to begin is to try to respond to some of the same questions that the court addressed to Mr. Mouw. We have different answers to those questions. And I think the place to begin is with the language of the restatement itself. There are three sections of the restatement that apply to this choice of law question. The first that Mr. Mouw didn't mention is Section 148, dealing with misrepresentations. That section applies to some of the misconduct alleged and proved by PMES in this case. And under Section 148, it's the place where the plaintiff relied on the misrepresentations that governs the choice of law of such claims, and that, of course, is in Connecticut. Next is Section 145, which deals with choice of law for tort claims in general. And there, the restatement sets forth four factors that are important to determine the choice of law. And the first and most important is the place where the injury occurred. And that unquestionably is in Connecticut. That's where PMES has its only facilities and manufactured these flanges. And the comment that there was some injury in California as well, Mr. Mouw didn't explain. In their briefs, they put out a theory that because PMES may have shareholders in California, that that should be considered. That's not the law. There's no case that supports it. It's contrary to basic rules of corporate law. Under the restatement, the comment E to the restatement explains that the place of injury is the primary factor in both PI cases and other cases. It's not limited. Let's say you're right. So let's just say Connecticut law applies. What do you do with these two big-picture reactions? This really just looks like a run-of-the-mill breach of contract case. So it's hard when you look at this to see a whole lot of evidence here of misconduct beyond not following the terms of the contract. And then the award of attorney's fees is so big in relation to the contractual damages. Your first reaction to the case is this just seems a little out of whack. So this assumes Connecticut law applies. Yes. So you're right about what you've been saying, but what do you say about these points? Well, we think there's an abundance of evidence of various types of violations of CUTPA in this case. And a breach of contract, or especially when there's multiple breaches of contract, that's a violation of CUTPA under Connecticut law. The unfair Bosol's threats and demands and duress, threats to bankrupt PMES, those are violations of CUTPA under Connecticut law. Wasn't Joe Zuhari's main concern the lack of notice? Was that – am I reading it? It's a pretty short analysis, but is it fair to say – It is a short analysis. And he said, for example, Bosol's misleading and sort of secret termination of the contract, along with he referred to their belligerent conduct. Secret terminations of contract, I mean, it's kind of a funny concept in a terminable at will contract. I mean, you don't have to announce, you don't have to telegraph what you're going to do. In fact, it's kind of foolish. If you say we're going to terminate this in six months, you may not get great product for the next six months, or it may not be timely done. So you kind of understand the incentive system of not telegraphing too far ahead that you think this relationship isn't working out. Well, it wasn't merely that they didn't notify PMES. They misled PMES. They promised to pay for the flanges that they received, and they had no intention of doing so, and they didn't do so. They induced PMES to continue performing when Bosol had already switched suppliers. And this caused PMES to go out and spend money on new equipment. When did you know? When did PMES actually know? I think the district judge said that it was sometime in December. Yes. 14th seems like the right date. But isn't there an October 28th email from somebody at your parent company? So arguably he knew even earlier than October 28th, saying, hey, it looks like they're going a different direction. It looks like they're switching their flanges, and now they've gone dark. So that's October 28th from an internal email. So arguably he knew before that. Well, there's a group of emails within PMES and with the related companies asking what happened, why aren't we, you know, why isn't- But how can you say you don't know if- Because there was no termination. There was silence. And silence is not the same thing as terminating a contract. They suspected something was going wrong because Bosol stopped communicating with them. But that's not the same as giving notice of termination, which the UCC clearly requires. I'd have to look at that email. But it seems like there was more than just they've stopped communicating to us, but actual knowledge that they were going a different direction. So how would he have known that? Well, the facts are not quite that far. All there was was silence. And the emails say, you know, has anyone been able to, you know, reach Bosol? They're not responding to us. And the last email says, you know, it looks like, you know, they've gone dark and maybe they're looking elsewhere. But that's not the same as terminating a contract. And they could have continued. They certainly should have paid for the flanges they already received, which they didn't do. And it was expected- All that stuff's breach of contract, right? That's one breach of contract. No, but I'm just saying when they say they're going to do something, they don't do it, or the contract requires them to do something, that's what you get out of a contract claim. Am I wrong in thinking CUTPA requires something worse? It's not a contract law enforcement act. Under CUTPA, for example, there are many different ways to violate CUTPA. A breach of contract may also constitute a violation of CUTPA if there are- And entitle us to attorney's fees. And entitle us to attorney's fees if there are, like, aggravating circumstances. So it's not just not paying. We will pay. We want you to keep filling the pipeline. That's what Mr. Snyder was saying from Belgium. And PMES believed him. And they went out and bought more equipment. And they continued working on a phony root cause analysis, which was not going to do them any good. And they spent a lot of time and effort based on these misrepresentations. So there is a breach of contract not paying. There are misrepresentations. We will pay you. Keep performing. Buy more equipment. Do the root cause analysis. That was all a lie. That's a violation of CUTPA. The breach of contract issue has been resolved, really. I mean, as I understand your claims, it's that Bozell engaged in this deceptive conduct. Yes. And that there are things that occurred after this October 28 memo from Mr. Palumbo until the termination, formal termination date of December 12. And I guess for my purposes, you know, what specifically? I guess maybe you've referenced the things that PMES continued to make these flanges, purchased equipment, more equipment, though I think that was purchased before October 28, earlier in October, and continued to participate in this root cause analysis, and that there's just this act of deception that would be actionable under CUTPA. Yes. That's a different type of claim from a breach of contract claim. So I think maybe you need to make that clear. Yes. And I think in our briefs we do make that very clear. I'm not saying you're not making it clear, but maybe more forcefully. Yes. And I think we do so there. And before termination, BOSOL's threats and duress to coerce PMES to accelerate production, to basically give up the 16 weeks of lead time that the parties had agreed to in the contract, these actions are also violations of CUTPA. So that gets you to the, you know, they would crush us. Yes, and bankrupt us. Right. And so I'm just trying to see, who's the they? Is the they BOSOL or is it GM? Yes. It's BOSOL. Mr. Mao's statements about there being a lot of communications between PMES and GM is simply untrue. There was almost zero communications between PMES and GM until the very end when GM showed up, had some people attend the root cause analysis, in Connecticut, by the way. But apart from that, all the communications about, you know, you have to start producing now, you have to accelerate production, that's all from BOSOL. GM had no role in that. GM's role, it had a contract with BOSOL. The center of the relationship between GM and BOSOL was probably in Michigan. But GM, under the restatement, it doesn't matter what GM, a non-party to the contract, a non-party to the case, it doesn't matter where they're based. All the sections of the restatement make no reference to non-parties and third parties. I guess I'm not as concerned about BOSOL conducting itself in a hard-nosed manner. Companies do that all the time in contracts and business relationships. So it's very common, as we all know, that, you know, parties can be aggressive and somewhat intimidating and demanding and maybe unreasonable. It seems that really the crux of your case is whether the conduct is, you know, is unfair conduct or deceptive conduct. Yes, and Judge Zuhari found that it was. Is that a factual finding in your view? Yes. We've cited several cases. The standard of review for a finding that actions were unfair or deceptive is the clear error standard. And there are possible legal issues, although not in this case under CUTPA, that could be de novo review. But the question of whether certain conduct is unfair or deceptive is judged by the clear error standard, and many cases so hold. Do you have more time? You don't have to use it. Believe me, if you covered everything, feel free to sit down. Sometimes that's the wiser course of action. It might be. But I would like to respond to Mr. Mao's comments about the Muncie case, which he said that shows that this court has held that the choice of law doesn't have to be the place of injury. And the Muncie court did so hold. That's a Sixth Circuit decision. And the reasons why are very important. In Muncie, the court did not apply the law of the place of injury. The crash occurred in Ohio. The court applied the law of Indiana. It's first important to note that in that case, Indiana was chosen because that's the place where the tank was manufactured in Indiana. And Muncie took delivery of the tanks in Indiana. And in this case, the flanges were manufactured in Connecticut, and Bosol took delivery of them in Connecticut. They may have then shipped them to who knows where, and GM may have shipped them somewhere else, and they may have ended up in Alaska. But for purposes of this contract, they were manufactured and delivered in Connecticut, as Judge Zuhari correctly held, obviously an issue of fact. But in the Muncie case, that's a contribution action. It followed the injured person's action. There was a first action in Ohio State Court governed by Ohio law. And the court in Muncie said that Ohio had an interest to compensate the driver. But that interest was satisfied in the prior lawsuit by the driver, Mr. Bolling. And so in the Muncie case, that was a contribution action between the two manufacturers. And so the court said because the interest, the important state interest in compensating the injured person was already satisfied, we're not going to focus on that. Muncie is an exceptional case. In this case, by contrast, the injured party, PMES, has not been compensated. And under the Pilgrim case and many other cases, the state with the most important interest under Section 6 of the Restatement of Conflicts is the state where the injured party resides. That state has an interest in compensating parties injured within their boundaries. And in this case, that's what happened to PMES. It was injured in Connecticut. Connecticut has the most important interest in compensating PMES. And therefore, for that additional reason, under Section 145, 148, and 6 of the Restatement, they all point to Connecticut. And under Connecticut law, under CUTPA, there are multiple violations of CUTPA. And in my last half minute, I'll just say that while the amounts of attorney's fees in this case were very substantial, that was not the fault of PMES. Bosol was very aggressive. It asserted a whole host of claims and arguments in the case that PMES had to address. It argued all sorts of things about what the contract was that the court found were untrue. And PMES was forced to make motions to compel discovery. Bosol had represented that it produced documents that it didn't produce. The court didn't find that out until the time of trial and imposed sanctions at that time. But it was a very active case, and we think under those circumstances, the fee amount was quite reasonable. Okay. Thank you, Mr. Moyasek. Turning to the CUTPA claim, the court's analysis, which was brief, sums up to this. The court concludes Bosol's actions in terminating the contract rise to the level of unfair conduct. That was it. Terminating the contract. This is highlighted by the two-month delay in notifying PMES. And the email... It is clear error review, right? It is clear error, but just like in Bolivar. Bolivar, second circuit decision, that was a bench trial. There has to actually be something in the record that supports this determination. And the record reflects unequivocally that PMES knew. The email that's referenced, it's worth reading it, from David Palambo. It's appendix 37. Craig, now that I'm back, and I had this as an item to review with you, looks like they went back, they, Bosol, looks like Bosol went back to an earlier design, which has a stamped flange, different flange, not the powder flange, but a stamped flange, and then went deep and silent. So they knew no later than October 28th that the agreement was over. They knew it was over because they weren't receiving releases. Yes, so I agree that Judge Zuhari's opinion on this, he didn't know what part of the case was going to be appealed, but this is a pretty brief, it's hard to know exactly what he's getting at, but it's clear error of view. And what I'm wondering if what he's getting at is deception is covered by the Connecticut law, and why can't one say there was some deception going on here in terms of what your client was doing and saying and what the only things that PMES was hearing? And it seems hard to say there wasn't some deception going on. It's unclear as to what the deception would be. It's the idea of the UCC claim with an agreement that's terminable at will. I mean, you pointed out a secret termination. I could simply walk away. You could walk away, and then you have a UCC claim. But Connecticut is deciding to punish deceptive terminations. But the framing it as there was – Does the Connecticut law say if it's a terminable at will contract? It does say. Well, it does say. Here's the question. That the Connecticut law doesn't apply? It doesn't say that. No, but it does say, though, that a breach of contract case does not arise to a level of cuppa absent substantial, substantial aggravating circumstances. Substantial deception. And we don't see it. There's nowhere here that there's substantial deception because it has to be from what the bowls will do when it's a terminable at will contract. Turning us back and leaving is not substantial deception. They couldn't have been deceived. They could not have been deceived when they knew in October it was over, when PMES's CEO testified at trial that he knew it was over. After October, did they invest in this new machine? No, they invested in it before. And there was nothing that Boesel said that induced them to do it. Boesel issued releases. A root cause investigation was being conducted to try to figure out why are these flanges cracked, which was led, as the record reflects, by GM. That they detrimentally relied upon the contract under the hope that Boesel might continue to order flanges in an at will contract, that's not deception. This is a breach of contract at most. We don't identify anywhere in there. If failing to give notice. So the crushing comment, that would be this is what business people do? Sorry? The crushing comment. We're going to crush you. Is that just a, it's like the equivalent of puffery. You know, when you're in sharp negotiations, both sides say this kind of stuff all the time. And we look where that ended. That's exactly right. And you look where it ended. It's the idea that, hey, we cannot shut down GM's production. Everybody agrees to that. I mean, you know, heaven will fall if we shut down GM's production. We can't do that. And so what happened? We worked with PMES to be able to meet the production. They asked, okay, can you expedite the raw materials to us quickly? Done. Can you pay to set up a press? Done. Can you buy us a new tool? Done. They reached an agreement on the ramp of production. There was discussion, holy cow, we've got to meet GM's requirements. And if we don't, you know, the creek's going to rise. It's not great. So they worked through a deal and reached it. That cannot give rise. That reaching an agreement cannot give rise to a cup of violation. And there is no deception here. The idea of terminating an agreement without notice, calling that deception. If we call that deception, then every UCC violation where there's a breach without notice is a deception. And that's inconsistent with CUPPA. CUPPA says we cannot have contract claims masquerade as CUPPA claims. Otherwise, the burdens and risks inherent in contract formation would be tolerably increased. And that's what this case reflects. Thank you, Your Honor. Okay. Thank you, Mr. Mao, Mr. Weinstock. We appreciate your arguments this morning. The case will be submitted. We may call the next case.